**The below described is SIGNED.**



**Dated: June 4, 2014**

_____

**JOEL T. MARKER**
**U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>SOPHIE B. HANSON,<br><br>       Debtor. | Bankruptcy Case No. 12-23198<br><br>Chapter 7 |
| JD INVESTMENTS OF UTAH, LLC, a Utah limited liability company,<br><br>       Plaintiff,<br><br>v.<br><br>SOPHIE B. HANSON,<br><br>       Defendant. | Adversary Proceeding No. 12-2219<br><br>Judge Joel T. Marker |

## MEMORANDUM DECISION

Sophie Hanson was in a bind.  Thanks to an employee's embezzlement, a strained relationship with her business partner, disappearing clients, and the start of the Great Recession, she found herself stuck with a debt-laden printing and publishing business, insufficient cash flow, and substantial guarantees that threatened to ruin her personal finances.  But a way out presented itself in the form of James Drake, a buyer who was willing to purchase the assets of the struggling business on terms that would get Hanson off the hook for most of her personal

guarantees and keep her employed to boot. Hanson made certain oral statements and provided

certain written statements as part of her efforts to sell the company and keep her job. This

§ 523(a)(2)(A) and (B) action centers on Hanson's candor with Drake in connection with those

transactions.[1]

The Court conducted a three-day trial on March 27, March 28, and April 4, 2014 and

took the matter under advisement. After considering the evidence properly before the Court,

assessing the credibility of the 10 witnesses,[2] considering the arguments of counsel, and

conducting an independent review of applicable law, the Court issues the following

Memorandum Decision to explain why the $864,426.37 purchase price but not the $20,000 or

$40,000 commission advance is being held nondischargeable.[3]

## I. FACTS

Newsletters Ink, Corp. was formed in 1997 to work with nonprofit trade associations to

address their communication needs by selling advertisements to pay for the publishing costs of

their trade magazines.[4] From a company with a couple of employees providing limited services

to one client, Newsletters grew by 2007 to have a couple dozen employees providing both

printing and publication services to many clients. At all times from inception of the business

until its sale to JD Investments of Utah, LLC, Sophie Hanson was the majority shareholder and

---

[1] All statutory references are to title 11 of the United States Code unless otherwise indicated.

[2] Generally speaking, of the three key lay witnesses—James Drake, Sophie Hanson, and Kevin Warwood— the Court found Drake to be the most credible by far. Hanson, both in general demeanor on the stand and in juxtaposition to the other evidence in the record, was substantially less credible than Drake on most issues. Warwood was highly evasive and the least credible witness of all.

[3] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052. Any of the findings of fact herein are also deemed to be conclusions of law, and any conclusions of law herein are also deemed to be findings of fact, and they shall be equally binding as both.

[4] The 1997 formation date is based on Hanson's testimony, and the exact year is immaterial to the Court's analysis; however, the Court notes that there is potentially conflicting information in the record as to the actual formation date, for example, the "Time [of] Current Ownership" box in Plaintiff's Exhibit 38 suggesting that Newsletters existed as far back as 1992.

Bryce Pollard was the minority shareholder.  At all relevant times, Hanson was also the president

of Newsletters, and only Hanson of the two shareholders had any involvement in the financial or

business management aspects of the company.

In 2008, Newsletters had a "small embezzlement issue" of about $10-$12,000 in its

bookkeeping/accounting office and started losing what would ultimately have been about $700-

$800,000 of its print base which Hanson attributed, in whole or in part, to Pollard's diversion of

Newsletters' printing business to a competitor.  She discovered Pollard's alleged activities in the

fall of 2008, and she fired Pollard in September 2008, but then the start of the Great Recession

further negatively impacted Newsletters' business as its nonprofit clients and advertisers were

cutting costs.  Hanson and her associate publisher Bill Lines discussed possible options for

Newsletters to weather these storms, including a refinance of obligations owed to Zions Bank

and Chase Bank.  But to make matters worse, under an existing loan covenant, Newsletters had

to provide reviewed financial statements to Zions Bank for the 2008 calendar year by June 2009,

and Zions Bank declined to discuss any refinance options until after those documents were

provided.[5]

Due to a "lack of continuity" with some internal accounting personnel and in anticipation

of the need for reviewed 2008 financial statements, Hanson hired non-CPA accountant Kevin

Warwood in September 2007 to, among other things, "[b]ring [Newsletters'] records into an

accurate and compliant to GAAP state" and "[b]egin the cursory process of preparing

[Newsletters'] books for a review by [its] CPA firm, as per [its] banking covenants."[6]  What he

walked into was a company that, like many businesses, used QuickBooks to perform its

accounting and bookkeeping functions.  And part of the company's business model involved the

---

[5] Hanson apparently began pursuing refinance options with Chase Bank in early 2009.
[6] Def. Exh. 6, p. 1.  This letter is dated October 31, 2008, but it references in the body that Warwood was
first hired in September 2007.

creation of trade magazines for client nonprofit organizations whose production costs were paid for by advertising sales.  So the company had contracts with nonprofits for the creation of magazines, although the nonprofits themselves might pay nothing to Newsletters, and separate contracts with individual advertisers for the placement of advertisements in the magazines. When an advertiser executed a contract with Newsletters that required Newsletters to place an advertisement in a particular magazine in exchange for the advertiser's payment of money, Newsletters would create an invoice in QuickBooks that would be issued to the advertiser and that would be booked as an account receivable.  And when the advertiser paid on that invoice, the payment would be credited in QuickBooks against the outstanding balance of the receivable.

Except for two specific accounts.  In the fall of 2006, the Utah Highway Patrol (UHP) became a customer of Newsletters as a nonprofit organization wishing to publish a trade magazine.  But even though the UHP was never obligated to pay Newsletters a dime and in lieu of listing each advertiser, Newsletters—with Hanson's full knowledge—began the practice of creating a dummy QuickBooks invoice for the UHP against which Newsletters would awkwardly journal and credit small-dollar advertiser payments that arrived in "dribs and drabs."  Hanson and Warwood discussed this practice, which Warwood himself testified was "unusual" and "different" at least in hindsight, after he began working for Newsletters in September 2007.  And not only did he continue that practice for the UHP, but he adopted it for the Colorado Highway Patrol (CHP) when it became a Newsletters nonprofit customer in late 2008 or early 2009.

Also in early 2009, Hanson engaged United Business Brokers (UBB) as a business broker to market Newsletters for sale.  Drake, who lives in Nebraska, was interested in other UBB opportunities in the Salt Lake City area, and he signed a Confidentiality Agreement and Agency Disclosure with UBB in March 2009 which indicates that UBB is acting as agent for the seller

4

and that UBB has made no effort to verify any of the information provided to it by Newsletters.[7]

UBB also provided Drake with what he called "almost a teaser copy" of UBB-formatted

Adjusted Financials for 2006, 2007, and 2008 that purported to show—again based solely on

unverified information provided by Newsletters to UBB—actual income and expense figures for

those years and hypothetical adjusted figures for a buyer who was able to wipe out the existing

business debt.[8]  These "teaser" financials and several subsequent conversations with Hanson and

Noall Knighton, a broker employed by UBB, piqued Drake's interest enough to continue his

investigation into the Newsletters opportunity.

Shortly after an in-person meeting with Hanson and Knighton at Hanson's office in

Murray, Knighton sent Drake a copy of a financial "review" of Newsletters' 2008 financial

statements that had been performed by Madsen & Associates CPAs, Inc. in late May 2009

(Madsen Report).[9]  As indicated in the cover letter and by Ted Madsen in his testimony, "[a]

review consists principally of inquiries of company personnel and analytical procedures applied

to financial data.  It is substantially less in scope than an audit in accordance with generally

accepted auditing standards, the objective of which is the expression of an opinion regarding the

financial statements taken as a whole.  Accordingly, we do not express such an opinion."[10]  The

cover letter also states that "we are not aware of any material modifications that should be made

to the accompanying financial statements in order for them to be in conformity with generally

accepted accounting principles," and it reiterates the going concern information that is contained

in the Notes to the financial statements.[11]

---

[7] Pltf. Exh. 1; Def. Exh. 1.
[8] Pltf. Exh. 2.
[9] Def. Exh. 7.  This document is also incorporated into the Asset Purchase Agreement that is Plaintiff's Exhibit 6.
[10] Def. Exh. 7 ¶ 2.
[11] *Id.* ¶¶ 3-4.

Though the Madsen Report was not an audit, Madsen & Associates did "assist" Warwood with preparation of the Notes to the financial statements and did advise Warwood to make a number of substantial "modifications" for "contract receivables" and "deferred revenue," among other items, to provide an accurate picture of Newsletters' true receivables and cash flow. Note 1 of the Madsen Report discusses proper revenue recognition given Newsletters' business model, Note 6 discusses the nature of Newsletters' advertising contracts, and Note 8 raises doubts as to Newsletters' ability to continue as a going concern. The "Accounts Receivable and Allowance for Doubtful Accounts" section of Note 1 also indicates that Newsletters has no history of uncollectable accounts receivable and thus provides no allowance for doubtful accounts.

Drake gave the Madsen Report "some" weight, but it also raised a number of substantial issues in at least five areas that caused him to follow up with both Hanson and Knighton, though never Warwood. First, he requested clarification about the nature and existence of the accounts receivable as well as their 100% collectability. Second, he wanted to check on the accounts payable and deferred compensation to determine who was owed money by Newsletters, and he reviewed Newsletters' QuickBooks files in addition to his communications with Hanson and Knighton. Third, he wanted further information on Newsletters' short- and long-term debt, including the strategy for getting discounted payoffs of secured debt. Fourth, he was concerned about what appeared to be an understated commission rate, which would cause net income to be overstated. And fifth, he was troubled by the going concern statement in Note 8. But he ultimately determined that Newsletters could likely be returned to profitability in a couple of years if he could eliminate the outstanding debt, free up Hanson to drive sales, focus on a digital printing strategy, outsource certain large print jobs, and generate some operating cash from the collection of accounts receivable.

Drake and Hanson continued their discussions on several matters in June and July 2009, including Hanson's thoughts on driving future sales;[12] Drake's request for detailed information regarding actual and projected revenue data for 2009 along with the names of sales representatives;[13] and the agreed-upon delta of more than $300,000 between the accounts receivable and payable that Drake would be acquiring.[14]  Drake and Hanson even appeared to be working on a joint strategy to present to Chase Bank to obtain a reduced payoff of its secured debt.[15]

But Hanson was also engaged in discussions with Knighton and her legal counsel, to which Drake was not a party.  In these discussions, she described herself as being "creeped out by the large profit margin" shown in the May 31 financial statements and acknowledged that "[o]ur cash flow sucks" and that a "large portion of the receivables that make up the profit" was listed under the UHP and CHP accounts.[16]  She also expressed extreme urgency to get the sale done for a number of reasons—concern with Chase Bank coming after her in bankruptcy court;[17] being "tired" and wanting to get it over with;[18] fear of losing her home and having her personal finances ruined;[19] and wanting to save her employees' jobs.[20]  And although Hanson tried to explain away some of the language in these e-mails or chalk it up to mere venting, the Court finds that these communications support her knowledge of the inaccurate financial picture being painted for Drake and her incentive to keep Drake in the dark.

---

[12] Pltf. Exh. 4.

[13] Pltf. Exh. 5; Def. Exhs. 3 and 22.

[14] Pltf. Exhs. 8 and 13.

[15] Def. Exh. 5.

[16] Pltf. Exh. 3.

[17] Pltf. Exh. 12.

[18] Pltf. Exh. 14.

[19] Pltf. Exh. 16 ("I need this deal to go through.  If it does not; I don't have a home anymore – because I am personally liable for every stinking dime of debt Newsletters Ink has . . . .  This sale[] needs to happen or I will spend my retirement under a viaduct . . . .  [T]his deal needs to happen.").

[20] Pltf. Exh. 17.

All of this prologue led to Drake's formation of JD Investments in early July 2009 and the drafting of an Asset Purchase Agreement (APA) with a closing date of July 15, 2009.[21] The APA was executed by JD Investments, Newsletters, and Hanson individually; and it provided for a purchase price of $864,426.37 that would be used in full to pay off four debts to Chase Bank, Zions Bank, and Ayka Press, "the majority of" which Hanson had guaranteed.[22] As partially restated in ¶ 4.(g) of the Joint Pretrial Order,[23] the APA included a number of critical representations and warranties in §§ 3.3, 3.4, 3.7, 3.17, and 3.18 regarding the validity of the accounts receivable as well as the accuracy of the incorporated financial statements and seller disclosures. Schedule 3.4 to the APA contained balance sheets as of May 31 and July 7, 2009; profit and loss statements for January 1 through May 27 and July 7, 2009; and the Madsen Report.[24] Schedule 1.4(b) to the APA contained a listing of assumed accounts payable and loans as well as an accounts payable aging summary through July 7, 2009. Tabs 4 and 3, respectively, consisted of an Employment Agreement for Hanson's ongoing employment with JD Investments and a Promissory Note for $40,000 related to an advance on her future commissions. And Tab 7 consisted of an Escrow Deposit Agreement placing the relatively modest sum of $28,263 into escrow pending the occurrence of certain conditions precedent.[25] All told, in addition to the

---

[21] Pltf. Exh. 6. The APA contains the purchase agreement itself as well as a number of other Closing Documents including Disclosure Schedules, a Promissory Note and Employment Agreement, and an Escrow Deposit Agreement. *See id.*, p. 2 ("Index").

[22] This statement about Hanson's guarantees comes from the uncontroverted fact in ¶ 4.(f) of the Joint Pretrial Order (docket #43). The evidence at trial was unclear as to exactly which debts Hanson had guaranteed and in what amounts, but it was clear that the amount was substantial—and that Hanson herself believed it to be so at the time. *See, e.g.*, Pltf. Exh. 16 ("I need this deal to go through. If it does not; I don't have a home anymore – because I am personally liable for every stinking dime of debt Newsletters Ink has . . . . This sale[] needs to happen or I will spend my retirement under a viaduct . . . . [T]his deal needs to happen."). It was also clear that even though she had contemplated other possible strategies, including refinance and liquidation, the sale of the company was her primary focus.

[23] Docket #43.

[24] *See also* Pltf. Exhs. 30 and 31, respectively, for the May 31 balance sheet and the January 1 through May 27 profit and loss statement.

[25] *See also* Def. Exh. 17.

numerous other oral and written communications that Drake had with Hanson leading up to the sale closing, Drake reviewed at least the Madsen Report; the May 2009 financial statements; the July 2009 financial statements; the QuickBooks files; a number of Newsletters contracts; and the accounts payable summary as part of his due diligence before closing.

Shortly after closing and by various means, Drake experienced some "financial surprises" as he started to uncover troubling new information about JD Investments' acquisition. He learned that Newsletters had a small but outstanding debt for underfunding of its employees' 401(k) plans.[26] He learned that a large number of accounts had booking for revenue without any booking of accompanying expenses related to the costs of production. And most disturbing of all, he began to learn of the unique nature of the UHP and CHP accounts—specifically, that the alleged receivables did not really exist because Newsletters had no contracts with any advertisers as of the closing date that would require the payment of anything to Newsletters.[27]

In sum, the $124,948.95 in net income shown on the January 1 to July 7 profit and loss statement should have been reduced by $175-$275,000, leading to a negative figure.[28] The $530,081.93 in total accounts receivable shown on the July 7 balance sheet should have been reduced by $175,729, representing the total amount of the fictitious UHP and CHP receivables.[29] And although the amount of the 401(k) underfunding was very small, Drake was upset over the

---

[26] *See, e.g.*, Pltf. Exh. 11 (July 16, 2009 accounts payable aging summary listing Pensions West liability and increased MONY Life Insurance liability that were not contained in the July 7 accounts payable aging summary in Schedule 1.4(b) to the APA).

[27] *See, e.g.*, Def. Exh. 23 (July 27, 2009 e-mail from Drake to Warwood regarding how to use QuickBooks to "get [a] better handle on" the UHP and CHP accounts) and Def. Exh. 16 (August 6 e-mail from Drake to Hanson and Bill Lines regarding the "projected" nature of the UHP and CHP accounts); *see also* Pltf. Exhs. 21 and 22 (e-mails exchanged between Drake and Hanson on August 28 and September 1 in which Drake requested pre-closing correspondence to which he was not a party regarding the accounts receivable, the 401(k) issue, and "any other topic that you feel you disclosed to [UBB] and not to me"); Pltf. Exh. 32 (September 2 e-mail from Drake to Hanson raising his concerns about the pre-closing financial statements).

[28] Pltf. Exh. 6, Schedule 3.4.

[29] *Id.*; *see also* ¶ 4.(j) of the Joint Pretrial Order (docket #43).

nature of the issue more than its size.  Hanson did not seriously challenge Drake's assertions as to the nature or amount of these inaccuracies, and Drake credibly testified that he would not have entered into the APA—nor would he have hired Hanson—if he had known about these issues before closing.

But as all of these issues were coming to light, Drake still had a distressed business to run, although Hanson and a number of other defense witnesses spent a great deal of time trying to make the case that Drake himself drove the otherwise viable business into the ground.[30] Whatever the effect of his decisions, Drake worked with Hanson and his other employees to strategize and streamline business operations.  He released the $28,263 from escrow in mid-August, which Hanson tried to use as evidence of her compliance with the APA's representations and warranties, but Drake credibly testified that he considered the relatively small amount immaterial in the grand scheme as he was trying to keep things under control.[31]  He even sent Hanson a "heckuva job, Sophie" e-mail on August 28 thanking her for her "leadership and hard work."[32]  Drake credibly framed this as part of his effort to keep Hanson happy, given the critical nature of the sales director to the kind of company that he acquired and the other matters that he was dealing with in the early days of the company's operations under JD Investments' control.

Ultimately, after just about three months of operations, Drake decided to shutter the business in late October or early November 2009.  He and Hanson worked with Ken Rasmussen of Media Communications Group, Inc. (MCG) to sell outstanding publishing contracts to MCG. Legal counsel for Drake and Hanson exchanged letters regarding possible litigation in September

---

[30] *See, e.g.*, Def. Exhs. 8, 9, 11, 12, and 13.
[31] *See, e.g.*, Def. Exh. 18; Pltf. Exh. 39.
[32] Def. Exh. 10.

2010.[33]  Drake then filed suit against Hanson in Utah state court in February 2011, which was

stayed when Hanson filed this chapter 7 bankruptcy case on March 16, 2012.

## II. DISCUSSION

### A.    Purchase Price

JD Investments seeks nondischargeability of the $864,426.37 purchase price under

§ 523(a)(2)(B) based on Hanson's use of false financial statements to obtain the money from JD

Investments.[34]

Section 523(a)(2)(B) excepts from discharge any debt "for money . . . to the extent

obtained by use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's

or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for

such money . . . reasonably relied; and (iv) that the debtor caused to be made or published with

intent to deceive."  The plaintiff "must establish each element by a preponderance of the

evidence."[35]  And the exceptions to discharge contained in § 523(a) "are to be narrowly

construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the

debtor's favor."[36]

The requirement of a "writing" is fairly straightforward and contemplates that the

statement "must either have been written by the debtor, signed by the debtor, or written by

someone else but adopted and used by the debtor"—including financial statements submitted in

connection with a transaction closing.[37]  Although the element of "material falsity" is given a

[33] Pltf. Exhs. 34, 35, and 36.
[34] On October 25, 2013 as docket #39, the Court entered an order granting Hanson's motion for summary
judgment in part and only to the extent of dismissing JD Investments' claim for nondischargeability of the
purchase price under § 523(a)(2)(A).
[35] *First Nat'l Bank v. Cribbs (In re Cribbs)*, No. 05-6225, 2006 WL 1875366, at *2 (10th Cir. July 7,
2006).
[36] *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).
[37] *Id.*

number of semantic glosses in the case law and has not been definitively determined by the

Tenth Circuit, the basic idea is that the statement painted "a substantially untruthful picture" of

an entity's financial condition that objectively would, and subjectively did, affect a creditor's

decision to pay money to a debtor.[38]  As for the element of "financial condition," the Tenth

Circuit has held that false statements respecting the debtor's or an insider's financial condition

"are those that purport to present a picture of the debtor's overall financial health . . . [including]

those analogous to balance sheets, income statements, statements of changes in overall financial

position, or income and debt statements that present the debtor or insider's net worth, overall

financial health, or equation of assets and liabilities."[39]

As for reliance, "[t]he reasonableness of a creditor's reliance will be evaluated according

to the particular facts and circumstances present in a given case.  When evaluating the facts and

circumstances of the case, a bankruptcy court may consider, among other things: whether there

had been previous business dealings with the debtor that gave rise to a relationship of trust;

whether there were any 'red flags' that would have alerted an ordinarily prudent [buyer] to the

possibility that the representations [actually] relied upon were not accurate; and whether even

minimal investigation would have revealed the inaccuracy of the debtor's representations."[40]

"The standard of reasonableness places a measure of responsibility upon a creditor to ensure that

---

[38] *Fairfax State Sav. Bank v. McCleary (In re McCleary)*, 284 B.R. 876, 885 (Bankr. N.D. Iowa 2002);
*see also In re Candland*, 90 F.3d 1466, 1470 (9th Cir. 1996) ("A statement can be materially false if it
includes information which is 'substantially inaccurate' and is of the type that would affect the creditor's
decision making process."); *Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw)*, 895 F.2d
1170, 1172 (7th Cir. 1990) (discussing but not deciding between "important and substantial untruth" and
"but for" tests for material falsity); *Buckeye Ret. Co. v. Kakde (In re Kakde)*, 382 B.R. 411, 420-21
(Bankr. S.D. Ohio 2008) (discussing statement's effect on the creditor's "thought" or "decisionmaking"
process and stating that "[a] key and sometimes determinative consideration in evaluating the materiality
of a false statement is the 'size of the discrepancy'").
[39] *Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 714 (10th Cir. 2005).
[40] *Blue Ridge Bank & Trust Co. v. Cascio (In re Cascio)*, 342 B.R. 384, at *3 (10th Cir. BAP Aug. 4,
2005) (table).

there exists some basis for relying upon [a] debtor's representations."[41]   However, "§ 523(a)(2)(B) does not require that a creditor rely exclusively on the false financial statement. Partial reliance is enough . . . if it is substantial, even if the financial statement is not the most substantial factor."[42]

Finally, as for "intent to deceive," such intent is a subjective inquiry into the Debtor's knowledge and belief.[43]   This subjective intent "may be inferred from the totality of the circumstances," and "reckless disregard for the truth may be some evidence of an intent to deceive."[44]   That said, the Court must be careful to distinguish between mere negligence and subjective intent to deceive.   "[A]n honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive."[45]

Most of these elements are satisfied without serious challenge by Hanson.  The overstated accounts receivable in the May and July 2009 financial statements in Schedules 1.4(b) and 3.4 to the APA are the heart of JD Investments' § 523(a)(2)(B) claim, and they constitute a "writing" under *Kaspar*.  They are statements "respecting the financial condition" of Newsletters under the Tenth Circuit's strict *Joelson* standard, and Newsletters is an insider of Hanson under § 101(31)(A)(iv).  The financial statements are "materially false" given the relative nature and size of the discrepancies in Newsletters' accounts receivable that painted a "substantially

---

[41] *Id.*

[42] *Cribbs*, 2006 WL 1875366, at *3.

[43] *DSC Nat'l Props, LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 169 (10th Cir. BAP 2012) (analyzing "intent to deceive" under § 523(a)(2)(A)); *see also First Nat'l Bank v. Cribbs (In re Cribbs)*, 327 B.R. 668 (10th Cir. BAP 2005), *aff'd*, 05-6225, 2006 WL 1875366 (10th Cir. July 7, 2006) (analyzing "intent to deceive" under § 523(a)(2)(B)).

[44] *Johnson*, 477 B.R. at 169.

[45] *Id.* at 172 n.97 (*quoting In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005)); *see also Cribbs*, 327 B.R. at 673 ("A finding of reckless disregard should be very narrowly interpreted because a misrepresentation is fraudulent only if the maker 'knows or believes the matter is not what he represents it to be.'").

untruthful picture" of what JD Investments was purchasing.[46]  And JD Investments both actually and reasonably relied on those financial statements, at least in substantial part, in deciding to pay the $864,426.37 purchase price.

Hanson was the majority shareholder of Newsletters and held the title of president dating back to at least 1997, and she performed a large variety of functions for the company.  She was the only one of the two shareholders to have any involvement with the financial or operational aspects of Newsletters.  Despite her statement that accounting is her "Achilles heel," her overall testimony and the e-mails in the record demonstrate her intimate understanding of the financial aspects of the Newsletters business model, including the nature of the UHP and CHP accounts as mere labels for any number of small advertisers that she hoped would pay for advertising space.  But hope is not a contract, and the Court finds that Hanson either knew the pertinent facts and failed to disclose them or, at bare minimum, that she acted recklessly without an honest belief in the truth or foundation of her position even under the strict *Johnson* and *Cribbs* standards.

She discussed the unusual booking of the UHP and CHP accounts when she hired Warwood in September 2007.  In § 3.3 of the APA that Hanson signed, "Accounts Receivable" are defined as "valid obligations arising from services or products actually provided and properly billed in the ordinary course of business of the Seller.  Unless paid prior to the Closing, the Accounts Receivable are or will be as of the Closing Date valid obligations of the person indicated as being obligated to pay the applicable Account Receivable."  At trial, Hanson was confronted with her own deposition testimony in which she testified, in response to a question about what definition of accounts receivable she gave to Knighton, that an account receivable is when "we have a commitment for advertising and we send them an invoice and then we expect

---

[46] Consistent with his expert report received as Plaintiff's Exhibit 33, Kent Goates testified to the material falsity of the financial statements from an accounting perspective.  Drake also credibly testified to the critical nature of the financial statements in making his decision to enter into the APA.

to be paid." She also testified at trial to her knowledge that, as of the APA closing date, Newsletters had issued no invoices to either the UHP or CHP and that neither the UHP nor CHP would ever be paying any amounts to Newsletters. But she still hewed to the position that those accounts "loosely" fit her definition even though they were based solely on estimates or projections from past performance.[47] And ironically enough, just a few minutes after giving this testimony, she testified in connection with the 401(k) issue that she had not booked an account payable to either Pensions West or American Funds—even though she "knew there was a problem" and that money was owed—because she did not consider it a valid payable until she received a formal invoice.[48]

For his part, Drake and JD Investments' reliance on the financial statements was both actual and reasonable. He did not merely accept the financial statements as gospel. He reviewed the "teaser" financials provided by UBB. He reviewed the Madsen Report. He reviewed Newsletters' QuickBooks files and certain contracts. Throughout this process, he asked for further clarification and information from Hanson and Knighton. And then he reviewed the financial statements incorporated into the APA before closing. Expert Kent Goates testified that there was nothing in the Madsen Report "that would tip you into looking at anything further" into the UHP and CHP accounts.[49] Even Warwood, in a particularly nimble tap dance of testimony when asked by Hanson's own counsel if he believed that the booking of the UHP and CHP accounts as receivables on the balance sheet "fully gave a correct picture of the company," nervously paused before stating in gist that "it did as long as you consider that there were longer term payments coming due. If you just look at small figure [sic], you're not going to see the

---

[47] 3/28/14 Trial Transcript at 10:38:24 a.m. to 10:41:47 a.m.

[48] 3/28/14 Trial Transcript at 10:41:48 a.m. to 10:46:15 a.m.

[49] 3/27/14 Trial Transcript at 4:39:29 p.m. to 4:40:08 p.m.; *see also* Pltf. Exh. 33 (Plaintiff's Rule 26(a)(2) Expert Report).

whole picture.  And so, you look at one piece of paper with numbers, it doesn't always tell you the whole story."[50]

To be sure, Drake did not talk to Warwood at any point before closing, although Warwood testified only that he would have "done [his] best" to explain the UHP and CHP accounts if Drake had called and directly asked him about the accounts receivable.[51]  Warwood also testified that Drake could have discovered the truth of the UHP and CHP accounts if he had dug deeply enough into the QuickBooks files.[52]   And Bill Lines testified that during a conversation with Drake in the month after closing during which Lines continued to work for JD Investments, Drake said "I should have done better due diligence" while looking down at a spreadsheet.[53]

But none of this overcomes the evidence showing that Drake did ample and thoughtful due diligence in connection with the Newsletters purchase.   On the spectrum of perfect information by the buyer versus perfect information by the seller, the preponderance of the evidence on this record demonstrates that the fault was with Hanson rather than Drake.  Drake made substantial efforts to investigate the Newsletters business, while Hanson knew of but failed to disclose critical information that could and would have affected the sale.  Combining all of this with Hanson's clearly stated desire and incentive to close the deal for a number of reasons, the Court finds under the totality of the circumstances that she "made or published" the financial statements with the requisite intent to deceive.

---

[50] 3/28/14 Trial Transcript at 4:10:09 p.m. to 4:11:27 p.m.
[51] 3/28/14 Trial Transcript at 4:18:32 p.m. to 4:18:48 p.m.
[52] Hanson offered her Exhibit 20 in conjunction with Warwood's testimony on this point, but as noted by Drake, this document was not provided to Drake before closing; it was imported from QuickBooks and formatted in Excel by Warwood; it contains no notes even though the document states that "[t]he accompanying notes are an integral part of these financial statements"; and the document is otherwise incomplete (for example, the Customer Balance Summary is missing page 1 of 6).
[53] 4/4/14 Trial Transcript at 11:23:02 a.m. to 11:25:25 a.m.

To the extent that Hanson argues that she merely relied on information provided by her professionals, the Court rejects that argument. Not only is there sufficient evidence in the record of her own knowledge of the undisclosed information, but her actions are more akin to the debtor in *In re O'Donnell*, 728 F.3d 41 (1st Cir. 2013) than *In re Aste*, 129 B.R. 1012 (Bankr. D. Utah 1991). The Court also rejects any defense based on Drake's own purported failures in running a successful business after closing. The focus of § 523(a)(2)(B) is on the money that Hanson obtained through her actions, not Drake's subsequent efforts to salvage what he actually purchased as opposed to what he thought he was purchasing. "Regardless of whether causation is an element of a § 523(a)(2)(B) analysis, [Hanson's use of false Newsletters financial statements] was the proximate cause of [JD Investments'] losses in the present case."[54] To be clear, the overstated accounts receivable alone provide a sufficient basis for nondischargeability of the purchase price, with the overstated net income and 401(k) nondisclosure only exacerbating the situation.

## B.    Commission Advance

In addition to the purchase price of the Newsletters assets, JD Investments also seeks nondischargeability of the $40,000 Promissory Note contained in Tab 3 to the APA that represents an advance on future commissions for Hanson's work with JD Investments.

The elements of § 523(a)(2)(B) have already been discussed. As for § 523(a)(2)(A), it excepts from discharge any debt "for money . . . to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." "In order to establish a non-dischargeable claim under [§ 523(a)(2)(A)], a

---

[54] *Francin v. Fisher (In re Fisher)*, Adv. No. 03-2024, 2004 WL 1811264, at *5 (Bankr. M.D.N.C. Aug. 2, 2004). Even if Drake's post-closing operation of the business were relevant, the Court does not find that there is sufficient evidence in the record to demonstrate that Drake was the cause of the company's demise.

creditor must prove the following elements by a preponderance of the evidence: [1] The debtor made a false representation; [2] the debtor made the representation with the intent to deceive the creditor; [3] the creditor relied on the representation; [4] the creditor's reliance was [justifiable]; and [5] the debtor's representation [proximately] caused the creditor to sustain a loss."[55]

"As to the second element of the § 523(a)(2)(A) test, intent to deceive need not be shown by direct evidence but may be inferred from the totality of the circumstances and includes reckless disregard of the truth.  That said, the mere inability or failure to perform is not, in itself, sufficient evidence of fraudulent intent.  As to the third and fourth elements, the justifiable reliance standard is not reasonableness in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations.  Rather, the inquiry is whether the actual creditor's reliance was justifiable from a subjective standpoint.  In determining whether a creditor's reliance was justifiable, a court should therefore examine the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than applying a community standard of conduct to all cases.  Even under the justifiable test, however, the plaintiff must use his senses and at least make a cursory examination or investigation of the facts of the transaction before entering into it.  Moreover, this test does not leave objective reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the objectively reasonable, the greater the doubt about reliance in fact.  In effect, reasonableness goes to the probability of actual reliance."[56]

"And although § 523(a)(2)(A) generally requires false representations as to past or current facts rather than promises related to future actions, a debtor's misrepresentation of [her] intentions may constitute a false representation within the meaning of § 523(a)(2)(A) if when the

---

[55] *In re Pewtress*, Adv. No. 09-2491, 2010 WL 5108732, at *3 (Bankr. D. Utah Dec. 9, 2010) (*quoting In re Riebesell*, 586 F.3d 782, 789 (10th Cir. 2009)) (quotations and citations omitted).
[56] *Pewtress*, 2010 WL 5108732, at *4 (quotations and citations omitted).

18

representation was made the debtor had no intention of performing as promised.  To qualify as an affirmation of fact, a statement must be objective in nature, i.e., verifiable or capable of being proven true or false.  Similarly, to be relied upon as a promise, a statement must be highly specific or definite."[57]  Mere boasting or puffery does not suffice.[58]

The Court finds that JD Investments has not met its burden under either § 523(a)(2)(A) or (B).  Under § 523(a)(2)(A), Hanson's thoughts and hopes for future sales growth are not actionable statements as to presently existing facts or even sufficiently definite promises that go beyond mere puffery.[59]  Drake also points to Hanson's involvement with a company called newsLINK both before and after closing as evidence of her lack of intent to work for JD Investments.[60]  Not only do the documents themselves fail to support that notion, but Hanson credibly testified that newsLINK was a tiny company that she formed on behalf of her daughter Whitney in the fall of 2008, which was not in competition with Newsletters or JD Investments.  Hanson credibly testified that she worked full-time for JD Investments and only worked with newsLINK on the side.  Drake praised Hanson for her work no matter his underlying motive;[61] Hanson assisted Drake with getting outstanding accounts assigned to MCG when he shuttered the business;[62] and Drake was not even sure at trial whether he had actually advanced Hanson $20,000 or $40,000.  Hanson had just as much incentive to see the business succeed after closing as she did to get it sold in the first place because she needed the income, she wanted to maintain her reputation in the industry, and she was still on the hook for a $226,000 personal guarantee on

---

[57] *Id.* (quotations and citations omitted).
[58] *See, e.g., Phoenix Equity Ventures, LLC v. Baillio (In re Baillio)*, Adv. No. 08-1124 S, 2010 WL 3782065, at *23 n.23 (Bankr. D.N.M. Sept. 21, 2010); *Boud v. SDNCO, Inc.*, 54 P.3d 1131, 1135 (Utah 2002) (describing puffery).
[59] *See, e.g.*, Pltf. Exh. 4.
[60] *See, e.g.*, Pltf. Exhs. 14, 20, and 27.
[61] Def. Exh. 10.
[62] *See, e.g.*, Def. Exh. 19.

a digital press that JD Investments acquired from Newsletters.  And on top of all this, there is some suggestion that Drake may have already considered the advance repaid as of August 31, 2009.[63]

As for § 523(a)(2)(B), the argument has some superficial appeal in that Hanson obviously would not have worked for JD Investments in connection with the Newsletters business—nor would anybody else—if JD Investments had not purchased Newsletters' assets.  But there is simply insufficient evidence in the record to connect the dots between the false Newsletters financial statements and Hanson's specific employment with JD Investments.  Hanson's Employment Agreement and the Promissory Note are part of the APA Closing Documents under Tabs 4 and 3, but they are separate integrated agreements, and there is no specific mention of them in Tabs 1 and 2 which consist of the main purchase agreement and the Disclosure Schedules.[64]  Drake testified that he was intrigued by Hanson's high-energy, sales-oriented approach, but there was insufficient evidence in the record regarding the parties' employment negotiations and Hanson's continued involvement with the company as a substantial aspect of the deal.  And most importantly, the record in this case supports the conclusion that Drake hired Hanson based on her specific qualities—her personality, her ideas, and her desire to drive sales—rather than the numbers contained in the financial statements.  Even assuming that Hanson had been actively fishing for a job for herself in the lead-up to closing the sale, which is far from clear, it must be remembered that the Promissory Note represents an advance on future commissions.  It was tied to Hanson's anticipated work performance, and the record supports her contention that she did work diligently for the company after the sale closed whether the desired sales goals were met or not.  There was no evidence to explain the reason for the advance or how

---

[63] Def. Exh. 21.
[64] *See, e.g.*, § 3.10 of the APA ("Employee Matters"); Disclosure Schedules 3.10(a) and (b).

it was tied to the financial statements.  And again, it was not even clear whether Drake advanced

$20,000 or $40,000 or whether Drake considered the advance repaid as of August 31, 2009.  The

Court simply cannot conclude that Hanson obtained any of the commission advance by use of

false financial statements with the requisite intent to deceive.

### III. CONCLUSION

When a business transaction such as this one is subjected to an examination under the

nondischargeability standards of the Bankruptcy Code, the degree of candor by the seller versus

the degree of investigation by the buyer is often the pivotal issue along with the seller's intent.

This case is no different.  Unfortunately for Hanson, on this record and for the reasons stated

above, the Court holds that Hanson exceeded the bounds of honest dealing in connection with the

sale of Newsletters' assets to JD Investments, and the $864,426.37 purchase price is therefore

nondischargeable under § 523(a)(2)(B).  But JD Investments did not meet its burden as to the

$20,000 or $40,000 commission advance under § 523(a)(2)(A) or (B), and that portion of the

debt is discharged.  JD Investments is ordered to submit a separate judgment in accordance with

this Memorandum Decision.

-------------------------------------------END OF DOCUMENT-------------------------------------------

_____oooOooo_____
**SERVICE LIST**

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below.


Jared Inouye
Daniel K. Brough
Bennett Tueller Johnson & Deere
3165 E. Millrock Drive, Suite 500
Salt Lake City, UT  84121
    *Counsel for Plaintiff*

Michael L. Labertew
Labertew & Associates, LLC
1640 Creek Side Lane
Park City, UT  84098
    *Counsel for Defendant*

Trent J. Waddoups
Carr & Waddoups
8 East Broadway, Suite 609
Salt Lake City, UT  84111
    *Counsel for Defendant*